**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

SCHUMACHER IMMOBILIEN )
UND BETEILIGUNGS AD, )
 )
   Plaintiff, )
 ) **MEMORANDUM OPINION**
   v. ) **AND RECOMMENDATION**
 )
PROVA, INC. and CHRISTOPHER )  1:09CV18
WARD COX, )
 )
   Defendants. )

This matter is before the court on motions for summary judgment by both parties (docket nos. 30, 35). The parties have responded to the respective motions and, in this posture, the matter is ripe for disposition. Because the parties have not consented to the jurisdiction of the magistrate judge, I must address the motions by way of recommendation. For the following reasons, it will be recommended that each party's respective motions for summary judgment be denied in part and granted in part.

## I. STATEMENT OF CASE AND BACKGROUND

Plaintiff is a Swiss corporation with its principal place of business in Appenzell, Switzerland. (Compl. ¶ 1.) Plaintiff is a company created by Ulrich Schumacher, who buys and races unique race cars as a hobby. Defendant Prova, Inc. is a North Carolina corporation with its principal place of business in Chapel Hill, North

Carolina. (*Id.* ¶ 2.) Defendant Christopher Cox is a citizen of North Carolina and resides in Chapel Hill, North Carolina. (*Id.* ¶ 3.)

Here, Plaintiff alleges breach of contract and other claims related to two written contracts between the parties in which Plaintiff agreed to purchase from Defendant Prova a 1997 Porsche GT1 race car and various accompanying spare parts.[1] More specifically, Plaintiff alleges that Defendants breached the spare parts contract, breached the warranty of title and against infringement, and breached an express warranty that the parts would conform to various photos that were incorporated into the spare parts contract. Plaintiff also alleges an alternative claim against Prova for unjust enrichment. Plaintiff has also alleged various tort claims against both Prova and Cox, including fraudulent misrepresentation, fraudulent inducement, negligent misrepresentation, and unfair and deceptive trade practices. Plaintiff seeks direct, incidental, actual, and consequential damages for all claims other than the unfair and deceptive trade practices claim, for which Plaintiff seeks treble damages.

Both parties filed motions for summary judgment on May 17, 2010. In support of their motion, Defendants first allege that the claims against them should be barred

---

[1] Plaintiff filed his complaint against Defendants in this court on January 7, 2009, pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of citizenship. Since this is a diversity action brought in North Carolina, the court must apply North Carolina's choice of law rules. North Carolina's choice of law rules are well established and will not be restated here as both parties assume, and I agree, that North Carolina substantive law applies to all of Plaintiff's claims.

due to spoliation of the evidence.  Defendants also allege that Plaintiff's tort claims are prohibited by North Carolina's economic loss rule because they arise out of and are not separate or distinct from Plaintiff's breach of contract claims.  In addition, Defendants contend that Plaintiff cannot prove the tort or breach of contract claims as a matter of law.[2]  Finally, Defendants assert that Plaintiff's alternative unjust enrichment claim must be dismissed because North Carolina prohibits unjust enrichment claims when the parties have an express contract.  In its own motion for summary judgment, Plaintiff seeks a summary judgment ruling in Plaintiff's favor as to all claims, as well as an order for attorney fees.

## II. FACTS

In April and May 2008, Ulrich Schumacher, on behalf of Plaintiff, negotiated to purchase a well-known 1997 Porsche race car, GT1-005, and a spare parts package owned by Prova, Inc. through its agent, Cox. (Compl. ¶ 6.)  Schumacher's team was competing for a championship and the team was looking for a more competitive race car.  (Schumacher Dep. pp. 58-59.)  According to Plaintiff, Schumacher made clear during the contract negotiations that the GT1 spare parts were very important to Schumacher since he intended to use the GT1 for racing. (*See* Schumacher Dep. pp. 70-73.)  Before any contract was signed, Schumacher

---

[2]  Defendants further allege, alternatively, that  the damages available are limited by North Carolina's Uniform Commercial Code.  On this point, I agree, as the parties appear to agree that the contracts here involved the sale of goods within the meaning of the UCC.

asked Cox for a list or inventory of the available GT1 spare parts. (Pl.'s Ex. F.) The race car and the spare parts were at that time being stored in Pittsburgh, Pennsylvania, at a Porsche dealership called Auto Palace.

On May 3, 2008, in response to Plaintiff's request regarding the spare parts, Cox sent an email attaching an electronic pdf file of photographs showing a very large and expensive collection of GT1 spare parts, referred to by the parties as "the Champion Photos."[3] (*See* Pl.'s Ex. G.) The attachment was titled "993 GT1-005 Additional Info.pdf." (Pl.'s Ex. H.) In the email, Cox wrote, "As you can see from the attached photos, there are too many parts to list, but obviously enough to go racing for the next 20 years or so. I will personally make sure everything is packed up properly and goes along with the car transport." (Pl.'s Ex. G.)

Although Cox gave Plaintiff the opportunity before signing the two contracts to inspect the car and spare parts stored in Pittsburgh, Plaintiff chose not to conduct an inspection. (*See* Cox Aff. ¶¶ 11, 13.) On May 8, 2008, the parties executed two separate purchase agreements: one for the 1997 Porsche GT1, for a listed price of $800,000, and a second for the GT1 spare parts, for a listed price of $550,000. (Pl.'s Ex. I.) Under the spare parts contract, Prova agreed to sell, assign, and transfer ownership to Plaintiff:

> All their right and interest in and to the following Porsche GT 1 spare package (the "GT1-Spares") for the sum of $550,000.00 (USD). Seller

---

[3] The parties refer to the photos as "the Champion Photos" because the parties appear to agree that the photos were taken at a Champion Racing facility in Florida.

does hereby represent and warrant that he has and does hereby convey sole and complete ownership of the foregoing GT1-Spares, free of all liens and encumbrances. Seller agrees to transfer all GT1 Spares in his ownership to the Buyer. The GT1 Spares are documented in a file titled '993 GT1-005 Additional Info.pdf' sen[t] to the Buyer via email on Saturday, May 3rd, 2008. The GT-1 Spares are being sold "as is, where is" with no representations or warranties, express, or implied other than as specifically stated herein.

(Def.'s Dep. Ex. 38.)

Both the race car and the spare parts contracts provided that the purchase was final upon payment. Furthermore, the contracts provided that the race car and spare parts could remain in the Pittsburgh storage facility for an additional three months after purchase at no additional cost to Plaintiff. Finally, the contracts each provided that Plaintiff would be required to pay by May 9, 2008, an initial, non-refundable deposit of $250,000 for the race car, and $150,000 for the spare parts package. The remaining balances were due to be paid in full by May 23, 2008. Plaintiff wired the initial, non-refundable deposits on May 9, 2008. (Defs.' Dep. Ex. 54.) On May 21, 2008, Plaintiff made the final two payments, totaling $950,000. (*Id.*)

After the two contracts were signed, Schumacher arranged for Rudi Walch, another racing team owner/manager, to travel to the Auto Palace dealership in Pittsburgh where the race car and spare parts were being stored to oversee the packing and shipping of the race car and spare parts. When Walch arrived in Pittsburgh on June 11, 2008, he determined that the spare parts stored at the

dealership were different from the spare parts as shown in the Champion Photos that Cox had sent to Plaintiff. (Walch Dep. pp. 31-39.) Walch immediately contacted Schumacher and told him that many spare parts were missing. Schumacher, in turn, contacted Cox to say that a large number of GT1 spare parts were missing in Pittsburgh and that the situation was unacceptable. (Schumacher Dep. p. 133; Pl.'s Exs. E, J.)

While still at the car dealership, Walch told the car dealership owner David Scaife that the situation was unacceptable. (Walch Dep. pp. 40-43.) According to Walch's testimony, Scaife told Walch that if Walch wanted to remove the car, he must first remove the spare parts. (*See id.* pp. 40-43.) Scaife attests, on the other hand, that his instruction was merely that, if Walch took the parts, he was not to leave a mess for the Auto Palace staff to clean up. (Scaife Aff. ¶ 11.) Scaife attests that he never told Walch that he had to take the parts. (*Id.*)

Walch immediately called Schumacher, who told Walch that, although he was not going to accept all the parts, Walch still "had to get the parts out because, otherwise, [Plaintiff] could not get the car out." (Walch Dep. p. 40.) Walch oversaw the packing of the car and spare parts to be shipped to a facility in Atlanta. (Walch Dep. pp. 41, 44.) On June 12, 2008, Schumacher received from Walch a handwritten list titled "Missing Spares," listing certain parts that, according to Walch, were in the Champion photos, but which were missing from the storage room in Pittsburgh. (Defs.' Dep. Ex. 41; Schumacher Dep. p. 148.) On June 17, 2008,

Schumacher emailed Cox an inventory list and photographs of the parts that Walch had taken of the spare parts as he found them in Pittsburgh. At that point, Schumacher demanded from Defendants at least $350,000 in cash, or that Defendants "unwind the deal" and pay an additional cost. (Defs.' Dep. Ex. 62.)

According to Plaintiff, some very significant and expensive GT1 parts that appeared in the Champion Photos were missing from the dealership storage room when Walch went to retrieve them. (Walch Dep. pp. 31-32, 57-58.) Plaintiff contends, furthermore, that numerous parts in the Pittsburgh storage room were used and some were scrap that should have been thrown away some time ago. (Walch Dep. pp. 31, 32, 57.) Defendants do not appear to deny that the spare parts found in the Pittsburgh storage room were not identical to those as depicted in the Champion photos. Defendants dispute, however, Plaintiff's contention that the spare parts found in the Pittsburgh storage room were far less valuable than those shown in the Champion photos. Defendants also contend that certain parts that were listed as "missing" by Walch were never in the Champion photos to begin with.[4] It is undisputed that before the race car and spare parts were removed from the Pittsburgh storage facility, Defendants did not have the opportunity to inspect the parts in Pittsburgh to compare them to the parts in the Champion photos.

---

[4] As the court discusses *infra*, Defendants further contend that they never represented to Plaintiff that the spare parts contracted for were identical to those as depicted in the Champion photos.

Furthermore, sometime after the spare parts were shipped to Atlanta, Schumacher exported the race car, along with some of the parts, to Europe.

Plaintiff has presented evidence on summary judgment showing that, sometime in mid-April 2008, Cox had personally been in the storage room in Pittsburgh where the GT1 spare parts had been kept. (Cox Dep. pp. 92, 122.) After seeing photos taken by Walch showing the spare parts as they existed in Pittsburgh (*See* Ex. L ("the Pittsburgh Photos")), Cox admitted that the Pittsburgh Photos fairly and accurately showed the spare parts as he generally saw them earlier in Pittsburgh in mid-April 2008. (Cox Dep. pp. 136-40.) Cox also admitted that when he emailed the Champion Photos of the GT1 spare parts to Schumacher on May 3, 2008, he knew that the Champion Photos had been given to him when he first bought the car several years earlier. (Cox Dep. pp. 89-90.) Cox also admitted that he never told Schumacher that the number and condition of the spare parts as they existed in Pittsburgh was different from those shown in the Champion Photos that he sent to Schumacher on May 3, 2008. (Cox Dep. p. 127.) Cox contends that when he sent Schumacher the Champion Photos, he told Schumacher that he did not know what parts he actually had. Cox further testified in his deposition that he told Schumacher when he sent the Champion photos that a previous owner, Wayne Jackson, had given Cox the photos when Cox bought the car from Jackson. (Cox Dep. pp. 122-23.) Schumacher denies that Cox made this statement.

## III. STANDARD OF REVIEW

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting). When making the summary judgment determination, the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

## IV. ANALYSIS

Spoliation of Evidence

As noted previously, Walch removed the parts from the Pittsburgh storage facility before Cox had an opportunity to inspect the parts in Pittsburgh to compare them with the parts in the Champion photographs. On June 17, 2008, after having removed the car and parts, Schumacher emailed Cox an inventory list and photographs of the parts that Walch had taken from Pittsburgh. At that time, Schumacher demanded that Cox return $350,000 or "unwind the deal" and pay an "additional cost." (Defs.' Dep. Ex. 62.) Schumacher subsequently exported the car, along with some spare parts, to Europe, including two sets of wheels, two turbochargers, two carbon fiber side panels, and an ABS system. (Schumacher Dep. p. 172; Walch Dep. pp. 44-46.) The parties agree that the full inventory of the parts taken from Pittsburgh is, therefore, no longer intact for the purpose of comparing the Champion photos to what spare parts were found in the Pittsburgh storage facility. Defendants further contend that the "missing spares" list provided by Walch is wrong in that it includes several items that were not in the Champion photos.

Defendants contend that summary judgment should be granted in their favor and that this case should be dismissed due to Plaintiff's spoliation of the evidence, i.e., Plaintiff's failure to preserve as evidence the spare parts that were taken from the Pittsburgh storage facility. For the following reasons, it will be recommended

that the court deny Defendants' motion for summary judgment based on spoliation. I do find, however, that it is appropriate for the court to give the jury in this case an instruction that an adverse inference may be drawn against Plaintiff with regards to the spare parts that existed in the storage facility in Pittsburgh when Walch went to retrieve them in June 2008.

Although this case was brought under the court's diversity jurisdiction and generally requires the application of North Carolina substantive law, the federal law of spoliation applies because "the power to sanction for spoliation derives from the inherent power of the court, not substantive law." *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001); *see also Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 449-50 (4th Cir. 2004). "Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri*, 271 F.3d at 590. A party seeking sanctions for spoliation of evidence has the burden to prove the following elements:

> (1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 509 (D. Md. 2009) (quoting

*Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 219 F.R.D. 93, 101 (D. Md. 2003)).

Moreover, a party can be held liable for spoliation of relevant evidence by its agents.

*New Jersey Mfrs. Ins. Co. v. Hearth & Home Techs., Inc.*, No. 03:06-cv-2234, 2008

WL 2571227, at *7 (M.D. Pa. June 25, 2008). Courts have the power to impose

sanctions for spoliation of evidence in order to "preserve the integrity of the judicial

process in order to retain confidence that the process works to uncover the truth."

*Silvestri*, 271 F.3d at 590.

The first element of spoliation–that the party having control over the evidence

had an obligation to preserve it when it was destroyed or altered–has been met in

this case. Courts have noted that the obligation to preserve evidence obviously

exists once litigation is commenced, but it can also extend to the period before

litigation when a party reasonably should know that the evidence may be relevant

to anticipated litigation. *Silvestri*, 271 F.3d at 591 (citing *Kronisch v. United States*,

150 F.3d 112, 126 (2ᵈ Cir. 1998)). Here, as early as June 12, 2008, Plaintiff's agent

Walch informed Schumacher that the spare parts in the Pittsburgh facility were not

the same as the parts depicted in the Champion photographs. (*See* Dep. Ex. 41.)

Schumacher thereafter immediately contacted Cox by email to inform him that he

was not going to accept the car without an agreed-upon solution. Then, in an email

from Schumacher to Cox on June 18, 2008, Schumacher stated, in part:

I see three potential solutions for our problem.

A. We try to go after Kevin Jeanette which would mean I have to go after you and you have to go after Wayne and he will have to go after Kevin. I am willing to do what is needed but it sounds not very easy. I do not know Kevin but what I have heard about him now does not make me feel it is easy going. May be you or David has a chance to convince him to make an offer or to compromise.
B. I need a significant discount for the spare package of at least 350k $ or a comparable spare package.
C. If you have better options we unwind the deal, you send back the money plus the additional cost associated with the deal so I do not make any loss.

It would be good to talk later today to find a solution one or the other direction. It is an unpleasant development out of our own control and I hope we will find a fair "gentlemen like" solution.

(Def.'s Dep. Ex. 62.)

Here, at least by June 18 when Schumacher sent the email to Cox in which Schumacher threatened litigation, Schumacher (and, thus, Plaintiff) was on notice that litigation was reasonably foreseeable, therefore triggering the duty to preserve evidence relevant to the dispute. Plaintiff violated the duty to preserve the evidence by exporting some of the parts to Europe and potentially by moving the parts to Atlanta. Therefore, by the actions of Plaintiff's agent in exporting the spare parts, and potentially by moving them away from the storage facility in Pittsburgh in the first place, Plaintiff violated the obligation to preserve relevant evidence.

I further find that the second element–a culpable state of mind–has been met. Spoliation can be knowing or intentional even if it is not done with bad faith. *Buckley v. Mukasey*, 538 F.3d 306, 323 (4th Cir. 2008). From Schumacher's emails and the

testimony of Schumacher and Walch, it is clear that Schumacher intentionally had the spare parts shipped to Atlanta and that he then exported at least some of the spare parts with the car to Europe, even as he was aware that litigation was likely to ensue over the issue of the spare parts promised to Plaintiff and the spare parts that were actually in the Pittsburgh facility. As soon as Walch notified Schumacher that the parts in the Pittsburgh facility were not those in the Champion photos, Schumacher could have refused to take the parts. Instead of ensuring the preservation of the evidence, Schumacher and Walch made the choice to move the spares out of the garage and onto the truck headed to Atlanta, even though the contract between the parties allowed them to keep the car and parts in Pittsburgh until August 8, 2008, three months after the date of the contracts. Plaintiff contends that Walch was told that he had to remove the parts and the car together. At the very least, however, once the parts were shipped to Atlanta, Plaintiff should have kept all of the parts together. In sum, Plaintiff's acts of knowingly exporting some parts from Atlanta to Europe, and possibly the act of moving the parts from Pittsburgh to Atlanta, satisfy the culpable state of mind requirement for spoliation.

Finally, the third required element for the imposition of spoliation of evidence sanctions has also been met. Here, the evidence that was not preserved was clearly "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence. The evidence that Plaintiff failed to preserve–the exact collection of spare parts found in Pittsburgh–is critical to Defendants' defenses in this

case, since Plaintiff's claims center around the allegation that the parts stored in Pittsburgh did not conform to the spare parts package incorporated into the contract through the Champion pictures. Indeed, the critical evidence of damages as to Plaintiff's breach of contract/warranty claims is the value between the spare parts as they were stored in Pittsburgh when Walch came to get them, and the value of the spare parts as depicted in the Champion photos. *See* N.C. GEN. STAT. § 25-2-714(2) ("The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.").

In sum, I find that some type of sanction is appropriate based on Plaintiff's failure to preserve the spare parts in this case exactly as they were found in the Pittsburgh storage room. Courts may, in their discretion, impose a wide variety of sanctions for spoliation of evidence, including striking pleadings, precluding proof of facts, instructing the jury to draw adverse inferences from the loss or destruction of evidence, foreclosing claims or defenses, and dismissing the case or granting a default judgment. *See Silvestri*, 271 F.3d at 593. The "ultimate sanction" of dismissal is appropriate where the loss or destruction of the evidence was done in bad faith, or where the prejudice to the defendant is extraordinary and denies defendant the ability to adequately defend its case. *See id.* Defendants ask this

court to grant them dismissal on all of Plaintiff's claims as the sanction for spoliation of the evidence.

Dismissal is not appropriate in this case. First, Defendants have not shown that Plaintiff committed the spoliation in bad faith. Also, the prejudice to Defendants is not extraordinary and does not deprive them of being able to defend their case. Here, Plaintiff has made inventory lists and taken pictures to document the spare parts in the Auto Palace garage and in Atlanta. These lists and pictures provide Defendants with some opportunity to formulate a defense. Additionally, Wayne Jackson, who owned the race car before Prova, testified that the Champion pictures were taken before he ever owned the car, and that there were spare parts in the pictures which had been lost or destroyed before he ever owned the car, thus making it impossible for Prova to have ever owned them. Likewise, Cox testified that he was in the Pittsburgh storage room where the parts were stored shortly before entering into negotiations with Schumacher. Cox's deposition testimony suggests that Walch's pictures accurately reflect the parts as they were stored in Pittsburgh. In sum, Defendants have not been totally precluded from forming a defense, or of determining whether the parts stored in Pittsburgh conformed to the parts in the Champion pictures. Therefore, Defendants have not been extraordinarily prejudiced and dismissal is not appropriate. Instead, a more appropriate sanction is an instruction to the jury that it may draw adverse inferences against Plaintiff based on Plaintiff's failure to keep all of the spare parts intact.

<u>Plaintiff's Tort Claims</u>

<u>Fraud, Negligent Misrepresentation, and Unfair and Deceptive Trade Practices</u>

Both parties seek summary judgment on Plaintiff's tort claims. Defendants assert that Plaintiffs tort claims against them (fraud/fraudulent inducement, negligent misrepresentation, and unfair trade practices) should be dismissed because they merely arise out of Defendants' alleged breach of the parties' contractual obligations. For the following reasons, I find that neither party is entitled to summary judgment as to Plaintiff's claim for fraudulent inducement and unfair and deceptive trade practices.

In support of the claims for fraud and negligent misrepresentation, Plaintiff alleges that Defendants made fraudulent or negligent misrepresentations regarding the contents of the spare parts package. The representations referred to by Plaintiff are the email containing the Champion pictures and the inclusion of the Champion photos in the contract. Plaintiff contends that Defendants made material misrepresentations concerning the spare parts package either with the knowledge that the representations were not accurate, or without exercising due care in making the representations. Plaintiff alleges that Defendants made these representations about the spare parts package with the intent that Plaintiff would rely on the representations, and that Plaintiff justifiably relied on Defendants' fraudulent and/or negligent misrepresentations to its detriment.

It is well settled under North Carolina law that a mere breach of contract cannot sustain claims sounding in tort. *See N.C. Mut. Life Ins. Co. v. McKinley Fin. Servs., Inc.*, No. 1:03cv911, 2005 WL 3527050, at *8 (M.D.N.C. Dec. 22, 2005) (citing *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 346 (4th Cir. 1998) (finding that the district court erred "by allowing plaintiffs to advance tort and [unfair and deceptive trade practices under N.C. GEN. STAT. § 75-1.1] counts paralleling their breach of contract claims")); *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992) (holding that a mere breach of contract, even if intentional, does not give rise to an action for unfair and deceptive trade practices, absent "substantial aggravating circumstances attending the breach"). Thus, to state a non-contract claim in the context of a contractual relationship, a plaintiff must allege identifiable and distinct facts outside of the breach of contract. *N.C. Mut. Life Ins. Co.*, 2005 WL 3527050, at *9 (dismissing a negligent misrepresentation claim for failure to identify actions beyond failure to perform the contract). This rule is often referred to as the "economic loss doctrine." *See Johnson v. Sprint Solutions, Inc.*, No. 3:08-cv-54, 2008 WL 2949253, at *3 (W.D.N.C. July 29, 2008).

Defendants contend that Plaintiff's tort claims cannot be sustained because they stem from Defendants' alleged false representations regarding the composition of the spare parts package, which also forms the basis for Plaintiff's contract claims. In other words, Defendants contend that the court should dismiss Plaintiff's non-

contract claims because Plaintiff has failed to allege identifiable and distinct facts outside of the alleged breach of contract. I agree with Defendants that because Plaintiff has failed to allege some duty owed outside of Plaintiff's contractual relationship with Defendants, Plaintiff cannot state a claim for negligent misrepresentation; therefore, the court should dismiss this claim. *See id.* at *4 (dismissing a negligent misrepresentation claim where it was based on the same set of facts as the plaintiff's breach of contract claim and where the plaintiff alleged no independent duty); *US LEC Commc'ns, Inc. v. Qwest Commc'ns Corp.*, No. 3-05-cv-11, 2006 WL 1367383, at *2 (W.D.N.C. May 15, 2006) (dismissing fraud and negligent misrepresentation counterclaims for failure to allege a separate and independent duty outside of the contractual relationship). To this extent, Defendants' motion for summary judgment as to the negligent misrepresentation claim should be granted, and Plaintiff's corresponding motion as to this claim should be denied.

To the extent, however, that Plaintiff purports to allege a claim for fraudulent inducement of the contracts at issue here, Defendants' motion for summary judgment should be denied. *See Lithuanian Commerce Corp. Ltd. v. Sara Lee Hosiery*, 219 F. Supp. 2d 600, 607-08 (D.N.J. 2002) (where a plaintiff distributor alleged that Defendant Sara Lee fraudulently induced the distributor to execute a release involving parallel imports of panty hose, and then breached the settlement agreement, denying Defendant Sara Lee's Rule 50 motion for judgment as a matter

of law and allowing plaintiff to proceed to trial on both its contract and fraudulent inducement claims). The essential elements of fraud in the inducement are (1) a false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with the intent to deceive; (4) which does in fact deceive; (5) resulting in damage to the injured party. *State Props., LLC v. Ray*, 155 N.C. App. 65, 72, 574 S.E.2d 180, 186 (2002). Furthermore, the plaintiff's reliance on the defendant's representations must be reasonable. *Id.* Where a plaintiff fails to conduct any independent investigation, however, or if a plaintiff is informed of the true condition of the property, reliance is not reasonable. *Id.* at 73, 574 S.E.2d at 186. "The reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion." *Id.* (citing *Marcus Bros. Textiles, Inc v. Price Waterhouse, LLP*, 350 N.C. 214, 225, 513 S.E.2d 320, 327 (1999)).

On summary judgment, Defendants first contend that Plaintiff's fraudulent inducement allegations are based solely on Defendants' failure to perform the spare parts contract and are, thus, barred by the economic loss rule. I do not agree. Here, the facts are similar to those in *Wilson v. McAleer*, 368 F. Supp. 2d 473, 475-78 (M.D.N.C. 2005). In *Wilson*, the plaintiff alleged that the defendants fraudulently induced him to enter into brokerage contracts. The court there held that because the plaintiff alleged facts showing that the defendants "had a specific intent not to perform" at the time the defendants made the promise, the plaintiff stated a claim for

fraudulent inducement.  *Wilson*, 368 F. Supp. 2d at 477.  In holding that the plaintiff had sufficiently pled a fraudulent inducement claim separate from the breach of contract claim, the *Wilson* court emphasized the fact that the plaintiff's allegations were based on more than the defendants' alleged failure to perform the contract. Rather, the plaintiff "provide[d] particular allegations of defendants' motive, actions, and statements in support of the claim of fraud," over and above a mere allegation that the defendants' failure to perform the contract showed that they never intended to perform the contract.  *Id.*

Here, Plaintiff has alleged that Defendants fraudulently induced Plaintiff to enter into and execute the two purchase agreements through Defendants' representations concerning the quality, contents, and value of the spare parts package.  This alleged fraud occurred prior to and leading up to the formation of the contracts, and there is at least a question of material fact as to whether Defendants had an intent not to perform at the time the contract was made.  That is, Plaintiff has produced evidence showing that when Cox sent Schumacher the Champion photos, he knew that the photos were at least several years old, but he did not inform Schumacher of this fact.  Cox also admitted in his deposition that he had been inside the Pittsburgh storage area sometime before the Champion photos were incorporated into the spare parts contract and that he had seen what was in the storage unit.  This evidence is sufficient to raise an inference that Cox knew, when he sent Schumacher the Champion photos and before the photos were incorporated

into the spare parts contract, that the photos did not depict the actual spare parts that Plaintiff contracted to buy and that the actual spare parts available were worth less than those depicted in the Champion photos.  Thus, like the plaintiff in *Wilson*, Plaintiff has presented particular allegations of defendants' motive, actions, and statements in support of the fraud claim, over and above the mere allegation that Defendants' failure to perform the contract showed that they never intended to perform the contract.

Defendants contend, furthermore, that as a matter of law Plaintiff did not reasonably rely on Cox's representations regarding the spare parts because Plaintiff was given the opportunity to inspect the parts before entering the spare parts contract and failed to do so, and because Plaintiff could have learned the true facts by the exercise of reasonable diligence.  The court should not find, as a matter of law, that Plaintiff unjustifiably relied on Cox's representations here–that is, that the spare parts being purchased conformed to those in the Champion photos.  In other words, the issue of reasonable reliance is one for the jury.  First, Plaintiff has offered evidence showing that Schumacher did not send anyone to inspect the car or the spare parts before executing the contracts because of the time pressure that Cox put on Schumacher to "close the deal."  (*See* Schumacher Aff. ¶ 6, Ex. 4 to docket no. 80.)  Furthermore, after receiving the Champion photos in response to Schumacher's request for an inventory of the spare parts for sale, Schumacher sent an email to Cox, making it clear that he was relying on Cox's and his agent's

Mohlman's "fairness as businessmen." (*See* Schumacher Aff. ¶ 8.) Schumacher

attests that at that time he had no reason to doubt Cox's veracity because Cox never

indicated to Schumacher that the Champion photos were several years old, nor did

Cox ever state that he did not know what spare parts he owned. (*See id.*)

According to Schumacher, if Cox had conveyed uncertainty as to what parts were

to make up the spare parts contract, Schumacher would never have entered into that

contract. (*See id.*)

I find that Plaintiff has presented sufficient evidence on summary judgment to

raise an issue as to whether Plaintiff reasonably relied on Cox's representations

regarding the spare parts. That is, when Schumacher asked Cox to provide a list of

all of the spare parts to be sold, Cox provided actual photographs of the spare parts

to be sold. At that point, Plaintiff contends that it was entitled to rely on Cox's

representation regarding the spare parts and that Plaintiff was under no duty to

conduct any further inquiry into the spare parts. Plaintiff's point is well taken.

Indeed, the North Carolina Supreme Court has observed:

> The law does not require a prudent man to deal with everyone as a
> rascal, and demand covenants to guard against the falsehood of every
> representation which may be made as to facts which constitute material
> inducements to a contract. There must be a reliance on the integrity of
> man or else trade and commerce could not prosper.

*Johnson v. Owens*, 263 N.C. 754, 758, 140 S.E.2d 311, 314 (1965) (quoting *Cowart*

*v. Honeycutt*, 257 N.C. 136, 142, 125 S.E.2d 382, 387 (1962)); *see also Willen v.*

*Hewson*, 174 N.C. App. 714, 719, 622 S.E.2d 187, 191 (2005) (noting that even

where a plaintiff's reliance is unreasonable, sellers who intentionally misrepresent facts "should not be permitted to say in effect, 'You ought not to have trusted me. If you had not been so gullible, ignorant, or negligent, I could not have deceived you.'") (quoting *Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*, 172 N.C. App. 427, 438, 617 S.E.2d 664, 671 (2005)). In sum, Plaintiff has alleged an identifiable fraudulent inducement claim that is distinct from the breach of contract claim, and this court should deny Defendants' motion for summary judgment on Plaintiff's claim for fraudulent inducement. Finally, to the extent Plaintiff also seeks a ruling of summary judgment in favor of Plaintiff on the fraudulent inducement claim, the motion should be denied because genuine issues of fact exist, thus precluding a summary judgment ruling as to either party.

I further find that because there are issues of fact with regard to Plaintiff's fraud in the inducement claim, the court should also deny Defendants' motion for summary judgment as to Plaintiff's claim for unfair and deceptive trade practices. N.C. GEN. STAT. § 75-1.1 states that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."[5] N.C. GEN. STAT. § 75-1.1(a). To prove a claim for unfair trade practices in violation of Section 75-1.1, the plaintiff must show: (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting

---

[5]  A finding that a party has violated Section 75-1.1 entitles the plaintiff to treble its recovery of damages.  N.C. GEN. STAT. § 75-16.

commerce, (3) which proximately caused actual injury to the plaintiff or the plaintiff's business.  *Furr v. Fonville Morisey Realty, Inc.*, 130 N.C. App. 541, 551, 503 S.E.2d 401, 408 (1998).  The North Carolina courts have held that "[p]roof of fraud in the inducement necessarily constitutes a violation of Chapter 75 and shifts the burden of proof from the plaintiff to the defendant, which must then prove that it is exempt from Chapter 75's provisions."  *Whisnant v. Carolina Farm Credit*, __ N.C. App. __, __, 693 S.E.2d 149, 157 (2010) (quoting *Media Network, Inc. v. Long Haymes Carr, Inc.*, __ N.C. App. __, __,  678 S.E.2d 671, 684 (2009)).

Because I have already concluded that there are genuine issues of fact as to Plaintiff's fraud in the inducement claim, the court should also deny both parties' motions for summary judgment on Plaintiff's unfair and deceptive trade practices claim.  That is, if Plaintiff can prove fraud in the inducement, then Plaintiff has shown unfair and deceptive trade practices as a matter of law, unless Defendants can show that they are exempt from the unfair and deceptive trade practices act.  Defendants attempt to argue that the contract for the purchase of the spare parts in this case was not "in or affecting commerce," and thus does not fall with the unfair and deceptive trade practices act.  This argument has no merit, as the contract in this case was clearly one "in or affecting commerce."  In sum, for the reasons stated herein, the parties' respective motions for summary judgment as to the unfair and deceptive trade practices claim should be denied.

Plaintiff Claim for Breach of Contract to Purchase Spare Parts to the 1997 Porsche
GT1 for $550,000

Both parties have also filed motions for summary judgment as to Plaintiff's
breach of contract claim.  For a breach of contract claim, a plaintiff must show that
a valid contract existed, that there was a material breach of that contract, and that
damages resulted from the breach.  *Lee Cycle Ctr., Inc. v. Wilson Cycle Ctr., Inc.*,
143 N.C. App. 1, 10, 545 S.E.2d 745, 751 (2001).  Here, I first find as a matter of law
that a valid contract existed for the purchase of certain Porsche GT1 spare parts, as
specifically depicted in the photos attached to the contract, for a listed price of
$550,000.  (*See* Ex. I.)  The spare parts contract states, in part: "Seller [Defendants]
agrees to transfer all GT1-Spares in his ownership to the Buyer [Plaintiff].  The GT-1
Spares are documented in a file titled '993 GT1-005 Additional Info.pdf.'"  Here, this
language clearly means that Defendants agreed that the parts to be sold under the
contract were documented in the photos in the file titled "'993 GT1-005 Additional
Info.pdf.'"  Thus, there is no merit to Defendants' contention that Cox merely
promised to convey all of the spare parts that he currently owned, even if they were
not the same as the parts shown in the photos.  Indeed, as Plaintiff notes, this
interpretation of the spare parts contract would render the contract meaningless and
is contradicted by Defendants' own witnesses.[6]  That is, David Mohlman, acting as

---

[6]  Furthermore, Defendants contend that the warranty limitation language in the
contract "as is, where is" justifies Defendants' failure to convey all of the spare parts as

Defendants' sales agent in the transaction, wrote several emails to Cox after it was discovered that a significant number of spare parts sold under the May 8, 2008, contract were missing. In the June 12, 2008, emails, Mohlman told Cox that he had spoken with someone at Champion racing about the parts in the Champion Photos. Mohlman also wrote that Cox had promised those spare parts as part of the deal.[7] (Pl.'s Ex. M.)

In their summary judgment motion, Defendants have attempted to introduce evidence that is barred by North Carolina's parol evidence rule. North Carolina's parol evidence rule prohibits the consideration of evidence as to anything that happened before or simultaneously with the making of a written contract that would vary, add to, or contradict the terms of the contract. *Drake v. Hance*, 195 N.C. App. 588, 591, 673 S.E.2d 411, 413 (2009). Parol evidence may be admitted only where

---

shown in the Champion photos. I do not agree, as interpreting the contract in this manner would, again, render the terms of the contract meaningless.

[7] On June 12, 2008, Defendants' agent David Mohlman sent an e-mail to Cox, stating in relevant part: "I just went and viewed the [Champion] pictures of the parts and there is [definitely] going to be a problem if those parts aren't there. Shit, there are some very significant and expensive parts in the pics." (E-mail from David Mohlman to Chris Cox, June 12, 2008, Pl.'s Ex. C, Attachment 1 to docket no. 37.) The email goes on to state that if the matter cannot be resolved, Schumacher will want either "his money back" or "a big discount to compensate for the loss of the parts. I can't really blame him seeing how this was part of the deal . . . ." (*Id.*) The record contains another email from Mohlman to Cox the same day, in which Mohlman confirmed that there were at least some missing parts, and stating, "Your call but [Schumacher] knows the value of those parts and he is going to be quite upset. I know you gave him a discount but, unfortunately, you promised him all the parts as part of the deal." (E-mail from David Mohlman to Chris Cox, June 12, 2008, Pl.'s Ex. C, Attachment 1 to docket no. 65.)

it may aid in construing a contract with unclear or ambiguous terms. *Id.* Here, Defendants attempt to offer parol evidence to show that the parties did not contract for Plaintiff to purchase the spare parts as shown in the Champion photos. For instance, Defendants argue that sometime before the spare parts contract was signed, Cox told Schumacher that he did not know what spare parts he had before the contracts were signed.[8] Defendants contend that they are now excused from performing under the spare parts contract based on this statement. As Plaintiff notes, however, any promises made by Cox before execution of the contract is inadmissible parol evidence if it contradicts the express terms of the spare parts contract, which specifically incorporates the photos of the spare parts as shown in the Champion photos. Thus, the court should not consider evidence of the parties' pre-contract negotiations.

Defendants also argue that the two separate contracts should be read as a single contract because Schumacher entered into a separate contract for the spare parts for the sole purpose of reducing his tax liability. That is, Defendants suggest that the car itself was worth much more than $800,000 (the listed contract price for the car was $800,000, and the listed contract price for the spare parts was $550,000), and that the spare parts were worth much less than $550,000. Defendants suggest, therefore, that the price of the spare parts was artificially

---

[8] As noted in the court's fraudulent discussion, *supra*, Plaintiff denies that Cox ever made this statement.

inflated so Plaintiff could decrease his tax liability when he had to declare the value of the car to customs when he exported it. This evidence is inadmissible under North Carolina's parol evidence rule. That is, even if avoiding tax liability was Schumacher's motivation in entering into two separate contracts and in assigning a value of $550,000 to the spare parts, this evidence is inadmissible parol evidence, as the court must simply consider the plain language of the two contracts.[9] Here, the race car and spare parts contracts were clearly two separate contracts. As Plaintiff notes, on May 8, 2008, Plaintiff sent Defendants two contracts: the first contract was for the sale of the 1997 Porsche GT1 in exchange for payment of $800,000, and the second contract was for the proposed sale of the spare parts for the 1997 Porsche GT1 in exchange for payment of $550,000. Furthermore, Plaintiff made two separate down payments under two separate wire transfers: one for the race car contract and one for the spare parts contract. Plaintiff also made two separate, final payments of the balances due for the race car and for the spare parts. Thus, from execution of the contract to the payments, the parties treated the race car and spare parts contracts as two separate contracts. In sum, there is simply no basis for treating the two contracts as a single instrument, with the values of the race car and

---

[9] Indeed, Schumacher admitted in his deposition that he intended to separate the race car contract from the spare parts contract for specific tax reasons, see Schumacher Dep. pp. 86-90, 120-21), although he denies that he separated the contract for the purpose of fraudulently avoiding taxes, as suggested by Defendants.

spare parts as suggested by Defendants–i.e., that the contract was really for the purchase of the race car for $1.35 million, with free spare parts to be included.

Defendants also attempt to argue that the race car and spare parts contracts should be treated as a single contract based on the "usage of trade" doctrine under North Carolina contract law. That is, Defendants contend that in the historic race car sales industry, spare parts are always included in the contract for the car, and that they are never separated into two contracts. Under North Carolina's Uniform Commercial Code, a court may consider industry standards in determining the meaning of a contract that is ambiguous. *See* N.C. GEN. STAT. § 25-1-303. Usage of trade cannot be used, however, to undermine the plain language of the contract. *See* N.C. GEN. STAT. § 25-1-303(e). Here, evidence of usage of trade is not relevant because the spare parts contract unambiguously identifies the subject matter of the contract as the spare parts shown in the Champion Photos. Indeed, Defendants' "usage of trade" argument is really an improper attempt to offer inadmissible evidence in violation of the parol evidence rule. In sum, for the reasons stated herein, I find that the parties entered into an enforceable contract in which Plaintiff agreed to pay a listed price of $550,000, and in which Defendants agreed to sell, spare parts to the Porsche GT1, as depicted in the Champion photos that were expressly incorporated into the spare parts contract.

I further find there are genuine issues of fact as to whether Defendants materially breached the spare parts contract; thus, summary judgment is not

appropriate as to the breach of contract claim. Here, Plaintiff has presented evidence showing that at least some of the parts in the Champion photos were not included in the spare parts as Walch found them when he went to retrieve the spare parts in Pittsburgh. That is, all of Defendants' designated experts agree that Cox failed to provide all of the spare parts that were promised under the spare parts contract. (Starkey Dep. Vol. 1, pp. 198-201; Jackson Dep. pp. 76-79; Grossman Dep. p. 64.) One of Defendants' experts, Wayne Jackson, actually owned the race car and spare parts before Defendants owned them. Jackson testified that he did not have all the spare parts shown in the Champion Photos when he sold the car to the next owner, which was still before Defendants owned the spare parts. (Jackson Dep. pp. 36-37, 41-42.) Both Jackson and expert Elliot Grossman testified that not all parts shown in the original spare parts photos were in Pittsburgh when Walch showed up on June 11, 2008. Another defense expert, John Starkey, even made a list of what specific parts appeared in the original spare parts photos, but which did not appear in the photos of the spare parts taken in Pittsburgh and which did not appear in the written inventory of the spare parts that were in the Pittsburgh storage room. (*See* Pl.'s Ex. N, "Difference between spares at Champion, (presumably), in 2000 and in room photographed in 2007"; Pl.'s Ex. O, "John-Parts at Champion, Not in Inventure Value."). In sum, there are genuine issues of fact as to whether Defendants breached the spare parts contract.

In opposing Plaintiff's motion for summary judgment on the breach of contract claim, Defendants argue that the court should grant their own motion for summary judgment on Plaintiff's breach of contract claims because Plaintiff failed to give seasonal notice of any non-conformity within a reasonable time after accepting the spare parts. This argument fails. Failure to give seasonal notice of any non-conformity to a contract after accepting the goods bars a plaintiff from recovering under N.C. GEN. STAT. § 25-2-607(3). Defendants' motion for summary judgment should be denied because Plaintiff's notice of the non-conformity was not unseasonable as a matter of law. Plaintiff's acceptance became final upon its final payment May 21, 2008, per the written terms of the two contracts. Approximately three weeks later, Plaintiff put Defendants on notice of the alleged non-conformity. Plaintiff notified Cox of the problem, however, on the very day that Plaintiff's agent Walch discovered it.

Finally, I note that Defendants also attempt to assert the "substantial performance" defense to avoid liability for breach of the spare parts contract. The "substantial performance" doctrine was "conceived for use in a situation where the obligor-plaintiff has given the obligee-defendant a substantial portion of that for which he bargained and the performance is of such a nature that it cannot easily be returned." *Black v. Clark*, 36 N.C. App. 191, 195, 243 S.E.2d 808, 811 (1978). Typically, the claimant has almost fully performed under the contract but has not been paid for his work. *See id.* Here, Defendants cannot assert the substantial

performance doctrine because they were paid in full by Plaintiff under the spare parts contract.

In sum, for the reasons stated herein, there are genuine issues of fact as to Plaintiff's breach of contract claim; thus, each parties' respective summary judgment motion as to this claim should be denied.

Unjust Enrichment Claim

Next, Defendants assert that they should be granted summary judgment on Plaintiff's alternative unjust enrichment claim because North Carolina law bars unjust enrichment claims when there is an existing contract between the parties. I agree. To recover on a claim of unjust enrichment, a party must prove that it conferred a benefit on another party, that the other party consciously accepted the benefit, and that the benefit was not conferred gratuitously or by an interference in the affairs of the other party. *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988). An unjust enrichment claim is neither in tort nor in contract but is, instead, "described as a claim in quasi contract or a contract implied in law." *Id*. North Carolina courts have held that if there is an express contract between the parties then the contract governs the claim, and the law will not imply a contract to prevent "unjust enrichment." *See id.*; *see also Vetco Concrete Co. v. Troy Lumber Co.*, 256 N.C. 709, 713, 124 S.E.2d 905, 908 (1962). Here, because there is a signed contract governing the spare parts transaction between the parties, Defendants' motion for summary judgment on Plaintiff's unjust enrichment claim should be granted. To this

extent, Plaintiff's motion for summary judgment on the unjust enrichment claim should be denied.

<u>Plaintiff's Claim for Breach of Express Warranties As to the Number, Type, and Quality of the Parts Being Sold under the Spare Parts Contract</u>

I next address the parties' respective motions for summary judgment as to Plaintiff's claim for breach of express warranty. Section 25-2-313 of the North Carolina General Statutes provides, in relevant part:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

N.C. GEN. STAT. § 25-2-313. In support of the claim for breach of express warranty, Plaintiff contends that by providing the Champion Photos and by incorporating them into the spare parts contract, Defendants warranted that the spare parts package would conform to the pictured parts in value, type, number, and quality. Plaintiff contends, for example, that by providing photos of JRZ shock absorbers, Defendants affirmed and promised that this specific brand of shock absorber would be sold to Plaintiff. I agree with Plaintiff and find that Defendants made express warranties that the spare parts being purchased conformed to the parts as shown in the

Champion photos in value, type, number, and quality. For the same reasons given as to the breach of contract claim, however, I find that there are genuine issues of fact as to whether Defendants breached those express warranties. Plaintiff has presented some evidence that Defendants breached this express warranty. Plaintiff notes, for instance, that although some shock absorbers were in the Pittsburgh storage area when Walch went to retrieve the parts, none of them were JRZ brand shocks, despite that the shock absorbers in the Champion photos are JRZ brand shocks. As another example, Plaintiff contends that the Champion photos showed eight or nine complete turbochargers, that only four turbochargers were found in the Pittsburgh storage area, and that the turbochargers in Pittsburgh were in much worse condition than those shown in the Champion photos. (Walch Dep. pp. 51-57.) In sum, for the reasons stated herein, there are genuine issues of fact as to whether Defendants breached express warranties; thus, summary judgment is not appropriate as to this claim.

## V. CONCLUSION

For the reasons stated herein, it is **RECOMMENDED** that each party's respective motions for summary judgment (docket nos. 30 and 35) should be **GRANTED IN PART** and **DENIED IN PART**. As a preliminary matter, Defendants' motion for spoliation sanctions should be **GRANTED** in that the jury should be instructed that it may draw an adverse inference against Plaintiff for spoliation of the spare parts package. Defendants' motion for summary judgment should be

**GRANTED** with respect to Plaintiff's claims for unjust enrichment and negligent misrepresentation.  Both parties' motions for summary judgment should be **DENIED** with respect to Plaintiff's claims for fraudulent inducement, unfair and deceptive trade practices, breach of contract, and breach of express warranties–that is, genuine issues of fact exist as to each of these claims.

_____
WALLACE W. DIXON
United States Magistrate Judge

July 21 , 2010